# Illinois Official Reports

## Appellate Court

---

*In re Parentage of M.M.*, 2015 IL App (2d) 140772

---

| | |
|---|---|
| Appellate Court Caption | *In re* PARENTAGE OF M.M. (Cliff M., Petitioner-Appellee, v. Jennifer L. Barnhart, n/k/a Jennifer L. Lyons, Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-14-0772 |
| Filed | March 26, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 96-F-378; the Hon. Timothy J. McJoynt, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | George S. Frederick, of Mirabella, Kincaid, Frederick & Mirabella, LLC, of Wheaton, for appellant.<br><br>Win Wehrli, of Naperville, for appellee. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion. Presiding Justice Schostok and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1        M.M. is the college-aged daughter of petitioner, Jennifer L. Lyons, and respondent, Cliff M., who were never married. Following a hearing on Jennifer's petition for allocation of M.M.'s educational expenses, the trial court apportioned the costs of attending Augustana College among Cliff, Jennifer, and M.M. Jennifer appeals, arguing that she lacks the financial resources to satisfy her court-ordered obligation and that the court improperly considered her new husband's income. We agree with Jennifer's second argument, and we reverse the trial court's order and remand for further proceedings.

¶ 2                                I. BACKGROUND

¶ 3        On December 5, 1996, Cliff filed a petition for declaration of a father/child relationship with respect to M.M. On January 2, 1997, the trial court entered an order finding that Cliff was M.M.'s biological father. That order incorporated a settlement agreement (Agreement), which included a joint parenting agreement. The parties agreed that Jennifer would have primary residential custody of M.M. and that Cliff would pay $468 per month for child support. The Agreement required Cliff to pay for M.M.'s medical insurance, but the parties agreed to equally share any uncovered medical, dental, and optical expenses. If M.M. pursued a college education, the parties' obligations with respect to medical expenses would continue until she completed her educational pursuits, discontinued her pursuits, or turned 23 years old.

¶ 4        The Agreement also provided that "[t]he issue of the responsibility for the child's college and/or trade school expenses shall be determined by the financial conditions of the parties at the time said expenses are incurred." The parties agreed that "[a]ll decisions affecting the child's education, including the choice of college or other institution, shall be made jointly by the parties and shall consider the expressed preference of the child." Such "obligation to provide the education for the child" was conditioned upon (1) M.M. having "the desire and aptitude for a college education or vocational education" and (2) the undergraduate education being limited to four consecutive years beginning not more than one year after high school graduation, except in the case of "serious illness or other good cause shown."

¶ 5        On July 30, 2013, Jennifer filed a petition for modification of child support. That same day, she also filed a petition for allocation of educational expenses in accordance with sections 510 and 513 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/510, 513 (West 2012)). On March 18, 2014, the court entered an agreed order increasing Cliff's child support obligation to $1,230 per month, retroactive to August 1, 2013. Cliff's obligation continued until August 14, 2014, when M.M. turned 18 years old.

¶ 6    On June 19, 2014, the court held a hearing on Jennifer's petition for allocation of educational expenses. The parties stipulated to the following facts. The cost of attending Augustana College, M.M.'s school of choice, for the 2014-15 school year was $51,403. The cost of attending the University of Illinois would have been $30,450 to $35,454, depending on the program. M.M. had been awarded $24,500 of assistance from Augustana for 2014-15, which included a $22,000 presidential scholarship, an early-filing award of $500, and a $2,000 music scholarship.[1] The presidential scholarship is renewable each year if M.M. maintains a 3.0 grade point average. Apart from this assistance, she is eligible for $5,500 in federal direct unsubsidized loans if she attends Augustana.

¶ 7    The parties also stipulated that Cliff's gross income was $97,457.51 in 2010; $99,219.23 in 2011; $106,667.12 in 2012; and $100,752.29 in 2013. Cliff owns three properties, including a house in Winfield, Illinois, with net equity of $32,532.19; a house in Lanark, Illinois, with net equity of $161,086.04; and a lot in Lanark with net equity of $19,000. Cliff has a college savings plan for M.M. worth $16,546.97, mutual funds with Edward Jones worth $35,679.31, a brokerage account with Benjamin Edwards worth $16,499.48, and a Roth individual retirement account (IRA) with Benjamin Edwards worth $19,011.25. Additionally, his pension will be either $3,441 or $3,957 per month, depending on when he retires. Cliff also has a life insurance policy with a cash value of $1,240.66 and a checking account of nominal value.

¶ 8    The parties stipulated that Jennifer had no gross income between 2010 and 2013. However, she and her husband, Tim Lyons, jointly own a home in Batavia, Illinois, with net equity of $51,617.14. She also has a life insurance policy with a surrender value of $4,272.61 and IRAs and a retirement annuity worth $38,072.58. She has checking and savings accounts of nominal value.

¶ 9    Jennifer testified that she has been a stay-at-home mother since June 2000. Before that, she worked full-time at Jenny Craig Weight Loss Center for 10 years and earned at most between $27,000 and $34,000. She does not have a college degree or special training, qualifications, or experience to boost her employability. She married Tim in July 2000, and they have two children together: a 9-year-old daughter and a 10-year-old son. Their daughter has certain health issues, and Jennifer homeschools her. At the time of the hearing, M.M. also resided with Jennifer and Tim.

¶ 10    Jennifer testified that, apart from the child support that she was receiving at the time of the hearing, she did not have any source of income. Tim, an engineer, paid all of the family's monthly expenses of about $7,600. Their joint income tax returns for 2010 through 2013 were admitted into evidence, but they are not included in the record on appeal. Jennifer insisted that she did not receive any of the money listed on the tax returns and that it was all Tim's income.

¶ 11    Jennifer described her lifestyle as modest. She drove a 2005 Chrysler Town and Country, although Tim owned a BMW.[2] Tim did not give her an allowance, and they did not have any

___

[1]Jennifer testified at the hearing that the music scholarship was for $2,500. Counsel did not clarify whether Jennifer was mistaken as to the amount. The trial court ultimately allocated expenses in light of a $2,000 music scholarship.

[2]According to Jennifer's financial disclosure statement dated June 11, 2014, she and Tim also jointly owned a Ford Explorer acquired in 2003.

joint bank accounts. Nor did she have access to Tim's bank accounts. She did have credit cards for household expenses, but Tim paid those bills. She also had checking and savings accounts worth $2,400, into which she deposited her child support payments. Additionally, although she and Tim jointly owned their home, she recently attempted to take out a line of credit to see if she could do so without her husband's agreement, and she was denied. Although she had retirement accounts, she could not use her IRA funds without incurring penalties and taxes.

¶ 12    Jennifer testified that, at the time of the hearing, M.M. was 17 years old and was enrolled at Augustana for the upcoming school year. Jennifer acknowledged that M.M. had the time, desire, and aptitude for a college education. However, Jennifer believed that it was not necessary for her daughter to attend Augustana and said that M.M. could attend a junior college for $4,000 per year. When Cliff enrolled M.M. at Augustana, Jennifer had not agreed that M.M. could attend that school.

¶ 13    According to Jennifer, she did not have the financial resources to pay for any of M.M.'s college expenses. Specifically, she did not have an agreement with Tim to help her pay. Nor did she and Tim have college savings accounts set up for the two children they had together. Nevertheless, Jennifer indicated a willingness to contribute by continuing to pay one-half of M.M.'s uncovered medical and dental costs, providing room and board during school breaks, and relinquishing a tax write-off.

¶ 14    Jennifer recalled a conversation with Cliff in May 2002, during which he told her that she "didn't have to worry," because his father had left enough money to take care of M.M.'s college. Jennifer also testified that, pursuant to the 1997 court order, Cliff paid her $468 per month for child support until she petitioned for an increase in 2013. She claimed that the reason that she did not file a petition to increase support until 2013 was that she believed that Cliff would pay for M.M.'s college education. Jennifer testified that she was not able to save any of the child support money in a college savings account, because the amount she received was "barely enough to cover the bills." The $468 per month that she received for child support was used to pay M.M.'s expenses.

¶ 15    Cliff also testified at the hearing. He was not married, and he had no children to support other than M.M. He was employed as a firefighter, and he planned to retire in a year or two. He also owned a construction company that was formed in February 2013, but that company had no profit. He explained that he had approximately $35,700 in mutual funds with Edward Jones, which came from a lawsuit involving a 1992 accident. His Benjamin Edwards brokerage account, worth approximately $16,500, also came from a 1992 accident, but it was not clear from his testimony whether this was the same incident.

¶ 16    Cliff testified that he inherited approximately $100,000 when his father passed away in April 2001. He used that money to rebuild his home. Cliff's father also left M.M. $10,000 toward her education, and Cliff invested that in a college savings plan. He acknowledged having a conversation with Jennifer in May 2002, but he denied having said that the $100,000 he inherited was going to be used for M.M.'s education. Instead, he had explained to Jennifer that he received $10,000, which he was directed, as the executor of his father's estate, to apply to M.M.'s college education.

¶ 17    Cliff testified that he owned a 2004 Chevy Tahoe and an all-terrain vehicle. He also recently purchased a 2008 Chevy pickup truck, on which he was making payments. His average monthly income was approximately $8,200, and his total deductions and expenses

(excluding child support) were $6,665. Therefore, when his child support obligations ended in August 2014, he would have discretionary income of approximately $1,535 per month.

¶ 18    According to Cliff, Jennifer suggested, and he agreed, that M.M. should attend Augustana. He enrolled his daughter at Augustana but denied having done so without Jennifer's permission. He did not believe that he had the financial ability to pay on his own for M.M. to attend Augustana, but he acknowledged that he should contribute to the expenses.

¶ 19    In her closing arguments, Jennifer suggested that the Agreement, which referenced the parties' "financial conditions," not their "resources," might not be governed by section 513 of the Dissolution Act. She also argued that she had "very limited resources" and that her "financial condition is that of someone who is broke." She noted that her employability was "dismal," lacking a college degree and having been out of the workforce since 2000. She emphasized that she was "prohibited from finding a job," because she had children to care for, including one whom she must homeschool. According to Jennifer, she had no financial ability to pay any portion of M.M.'s college expenses, and if she were held in contempt of court for not paying, the "only way she will get bailed out" is if Tim gives her money.

¶ 20    Jennifer acknowledged that case law allows a court to consider a new spouse's income. However, she argued that a court may do so only "to the extent it frees up the other parent's ability to pay, use their [*sic*] income to contribute toward support." She contended that, because she had no income, the court should not "look at" Tim's income. Furthermore, she argued that Tim's payment of her living expenses did not constitute a gift under *In re Marriage of Rogers*, 213 Ill. 2d 129, 137 (2004) (holding that monetary gifts from one's parents constitute income for purposes of modifying a child support obligation). Finally, she argued that, if M.M. attended Augustana rather than a community college, M.M.'s inheritance money should be applied first, followed by the scholarships, and then Cliff should bear the majority of the remaining responsibility. Specifically, Jennifer proposed that her obligation should be to provide room and board during breaks and to continue contributing toward uncovered medical and dental expenses.

¶ 21    In his closing arguments, Cliff first noted that Jennifer had filed her petition pursuant to section 513 of the Dissolution Act. He argued that "all roads lead to the *Drysch* decision" (*In re Marriage of Drysch*, 314 Ill. App. 3d 640 (2000)) and that Tim's income "can and must be considered" by the court. Apparently referring to the joint tax returns admitted into evidence, Cliff noted that Tim annually earned between $119,000 and $160,000 over the past four years and paid all of Jennifer's family expenses.

¶ 22    The court found that the Agreement was "not a straight reservation" of the issue of college expenses. Instead, it created a contractual obligation for the parties to pay for college. The court "disagree[d] that [section] 513 is not part of the paternity proceedings," because that statute "has been incorporated in the paternity cases by case law." Nevertheless, the court deemed that issue irrelevant, because the Agreement "sets up a college obligation that was reserved to be determined later."

¶ 23    The court explained that Cliff and Jennifer "got a windfall," because M.M.'s expenses were reduced by scholarships, which made the cost of Augustana similar to that of the University of Illinois. The court indicated that it did not give much weight to "the cheaper choice alternative," finding that there was "a joint decision that the parties came to together, at least discussed." Additionally, with respect to Jennifer's testimony about her conversation

with Cliff in 2002 in which he allegedly told her that his father had left enough money to take care of M.M.'s college, the court determined that there was not enough evidence to find an oral contract between the parties. Nor did the court credit Jennifer's defense that she held off on seeking an increase in child support in light of the alleged 2002 agreement.

¶ 24 The court said that it was Jennifer's choice to be a homemaker and found that she "clearly has imputed income from her current spouse." The court indicated that Tim "makes around [$]130,000 a year," except for 2013, when his income went down a little bit. The court emphasized that Jennifer was not disabled and was "not unable to work" but, rather, was "basically choosing to do this sort of lifestyle." The court found that Jennifer's election to be a housewife was not a defense and did not negate her contractual obligation to pay.

¶ 25 The court clarified that it was not "giving a *Rogers* analysis," but concluded that Jennifer had imputed income. Specifically, the court stated that it could consider, under section 513 of the Dissolution Act, Jennifer's entire economic circumstances, including "her current husband who is paying for everything." Accordingly, the court determined, Jennifer "does have income, the current income from her engineer husband." Nevertheless, the court recognized that Jennifer's and Cliff's incomes, estates, holdings, and assets were disparate. The court added that, even though Cliff and Jennifer were not together anymore, they still had an obligation to M.M. To that end, the court suggested that if the parties were still together they would "pony up and maybe *** have to borrow some money."

¶ 26 The court's allocation of expenses was ultimately reduced to a written order on July 17, 2014. For the first year of college, the court found that there remained $26,903 in uncovered expenses (the $51,403 cost of attendance minus $24,500 in scholarships). The court ordered that the first $5,000 of those uncovered expenses would come from the college savings plan controlled by Cliff. Jennifer would then be responsible for $8,761 of the remaining expenses, and Cliff would be responsible for $13,142. For the second and third years of college, the first $4,000 would come from the college savings plan. M.M. would then be responsible for 22% of the total remaining expenses, which could be satisfied in full or in part by her scholarships. To the extent that the scholarships exceed M.M.'s 22% obligation, the excess scholarship amount would be credited to Cliff and Jennifer. Jennifer would be responsible for 33% of the remaining expenses, and Cliff would be responsible for 45%. The arrangement for the fourth year of college is the same as for the second and third years, except that the balance of the college savings plan, rather than a fixed amount therefrom, will be used first.

¶ 27 Jennifer timely appeals.

## II. ANALYSIS

¶ 29 Jennifer argues that the trial court erred in allocating responsibility for M.M.'s college expenses. Specifically, she contends that she does not have the financial resources to satisfy her obligation and that the court improperly considered Tim's income. For the reasons that follow, we agree that the court erred in imputing Tim's income to Jennifer. Therefore, we reverse and remand for further proceedings.

¶ 30 As an initial matter, we note that Jennifer does not contest the trial court's finding that the Agreement created a contractual obligation to pay for M.M.'s college expenses. Nor do the parties appear to dispute that our resolution of this appeal requires us to consider section 513 of the Dissolution Act and the cases interpreting that statute. The Agreement provides that

"[t]he issue of the responsibility for the child's college and/or trade school expenses shall be determined by the *financial conditions* of the parties at the time said expenses are incurred." (Emphasis added.) Section 513 states that one of the factors to consider is the "*financial resources* of both parents." (Emphasis added.) 750 ILCS 5/513(b)(1) (West 2012). In the trial court, Jennifer questioned in her closing arguments whether section 513 applied to this case. Nevertheless, on appeal, she does not challenge the applicability of section 513 and does not attempt to distinguish between "financial conditions" and "financial resources."

¶ 31    The parties disagree as to the proper standard of review. Cliff proposes that the abuse-of-discretion standard is appropriate. Jennifer acknowledges that this court has reviewed orders pursuant to section 513 for abuse of discretion (see *In re Marriage of Thomsen*, 371 Ill. App. 3d 236, 243 (2007)), but notes that the supreme court applied the manifest-weight-of-the-evidence standard in *In re Support of Pearson*, 111 Ill. 2d 545, 552 (1986). See also *In re Marriage of Cianchetti*, 351 Ill. App. 3d 832, 834 (2004) ("A trial court's decision to award educational expenses will be overturned only if it is against the manifest weight of the evidence."). It is true that the court in *Pearson* held that the trial court's judgment was not against the manifest weight of the evidence. *Pearson*, 111 Ill. 2d at 552. However, the court also said that section 513 "states that the court 'may' order a party to provide resources for a child's education [citation], and we think this language makes it plain that the legislature intended that the matter be addressed to the trial court's discretion." *Pearson*, 111 Ill. 2d at 551. We need not resolve this issue, because we would reverse under either standard of review.

¶ 32    Section 513 of the Dissolution Act allows a court, in certain circumstances, to "award sums of money out of the property and income of either or both parties ***, as equity may require, for the support of the child or children of the parties who have attained majority." 750 ILCS 5/513(a) (West 2012). One such circumstance is to "make provision for the educational expenses of the child or children of the parties." 750 ILCS 5/513(a)(2) (West 2012). When awarding educational expenses, relevant factors to consider include: (1) the financial resources of both parents; (2) the standard of living the child would have enjoyed had the marriage not been dissolved; (3) the financial resources of the child; and (4) the child's academic performance. 750 ILCS 5/513(b) (West 2012). Only the first factor is specifically at issue in this appeal.

¶ 33    The trial court imputed Tim's income to Jennifer. The court's comments suggest that it deemed Tim's income to be available to her for purposes of contributing to M.M.'s college expenses. As explained below, the court was entitled to consider Tim's income to the extent that his assistance frees up Jennifer's own assets for contribution. However, *Drysch* and its progeny do not provide a mechanism for imputing a new spouse's income to the other spouse. Nor did the court make the necessary factual findings to impute income to Jennifer based on voluntary unemployment, an attempt to evade a support obligation, or an unreasonable failure to take advantage of an employment opportunity.

¶ 34    In *Drysch*, we held that a court may consider, as part of a parent's "financial resources" for purposes of section 513, "money or property that could be available to [the parent] through her new spouse." *Drysch*, 314 Ill. App. 3d at 645. Significantly, we did not explain exactly *how* a court may consider a new spouse's income. In that case, pursuant to a marital settlement agreement, the judgment of dissolution included a provision for college expenses invoking the considerations of section 513. *Drysch*, 314 Ill. App. 3d at 641-42. The mother,

Vicky, filed a petition seeking contribution for college expenses from the father, Mark. *Drysch*, 314 Ill. App. 3d at 642. The evidence showed that Vicky worked as a real-estate agent with her new husband, Alex. *Drysch*, 314 Ill. App. 3d at 642. Alex paid Vicky $50,000 per year, and they pooled their money to meet expenses. *Drysch*, 314 Ill. App. 3d at 642. Alex and Vicky reported a gross income of $621,000 on their joint tax return for 1998. *Drysch*, 314 Ill. App. 3d at 642-43. The trial court admitted the tax return into evidence over Vicky's objection, reasoning that it was relevant in light of evidence that Vicky and Alex comingled money and the payment of expenses. *Drysch*, 314 Ill. App. 3d at 643. The court ordered Mark to pay 10% of the child's college expenses, and Vicky appealed, arguing, among other things, that the court erred in considering Alex's income in determining the amount that Mark should contribute. *Drysch*, 314 Ill. App. 3d at 643.

¶ 35 On appeal, we examined whether Alex's income constituted part of Vicky's "financial resources" to be considered under section 513. We observed that "[t]he term 'resources' has been defined as '[m]oney or any property that can be converted to meet needs' as well as the 'available means or capability of any kind.' " *Drysch*, 314 Ill. App. 3d at 644 (quoting Black's Law Dictionary 1178 (5th ed. 1979)). We reasoned that "[b]ased on the use of the word 'resources,' rather than a more narrow term, such as 'income' or 'salary,' we believe that the legislature intended that the trial court consider all the money or property to which a parent has access." *Drysch*, 314 Ill. App. 3d at 644-45. We said that "[t]his may include that parent's income, her property and investment holdings, as well as money or property that could be available to her through her new spouse." *Drysch*, 314 Ill. App. 3d at 645.

¶ 36 We found it significant that Vicky and Alex "pooled their income and money to pay their family expenses," because this made it "necessary for the trial court to consider her current husband's income in order to attain a complete grasp of her financial resources." *Drysch*, 314 Ill. App. 3d at 645. A contrary ruling "would defeat the plain language of section 513 by permitting Vicky to shield some of her financial resources from the trial court's consideration." *Drysch*, 314 Ill. App. 3d at 645. We acknowledged the traditional rule that "the financial status of the custodial parent's current spouse is not considered in proceedings to modify child support," noting that the rule "developed because the new spouse has no legal obligation for the support of his stepchildren." *Drysch*, 314 Ill. App. 3d at 645. Nevertheless, we perceived that "the law on this subject is evolving." *Drysch*, 314 Ill. App. 3d at 646. Accordingly, we held that "a trial court may equitably consider the income of a parent's current spouse in determining an appropriate award of child support." *Drysch*, 314 Ill. App. 3d at 646.

¶ 37 Unlike the court in *Drysch*, the court in *Street v. Street*, 325 Ill. App. 3d 108 (2001), specifically addressed the issue of how a trial court may consider a new spouse's income. In that case, the dissolution judgment reserved the issue of college expenses, and the mother, Linda, filed a petition seeking contribution from the father, Daniel. *Street*, 325 Ill. App. 3d at 110-11. The evidence showed that Linda had a net monthly income of $1,746 and received $860 per month in child support. *Street*, 325 Ill. App. 3d at 111. Linda and her current husband, Carl, jointly owned a home with $50,000 equity. *Street*, 325 Ill. App. 3d at 111. They also had a joint bank account and a mutual fund worth $25,000. *Street*, 325 Ill. App. 3d at 111. Linda refused to produce any documents pertaining to Carl's income and assets. *Street*, 325 Ill. App. 3d at 111. The trial court allowed some questioning as to Linda and Carl's joint assets, but did not permit inquiry as to Carl's assets or income. *Street*, 325 Ill.

App. 3d at 111-12. The court ordered Daniel to pay $9,000 toward the child's 2001-02 tuition at Bradley University in addition to $235 per month for living expenses while the child lived with Linda. *Street*, 325 Ill. App. 3d at 112. Daniel appealed, arguing that the court erred in denying discovery or inquiry into Carl's income and assets. He also contended that the court erred in ordering him to contribute to the cost of private schooling.

¶ 38    The appellate court recognized the current trend of departing from the traditional rule that "the financial assets of the current spouse are not relevant in making a support determination." *Street*, 325 Ill. App. 3d at 114. The court believed that, although each of the cases that it surveyed had involved the current spouse of the payor, "the same underlying principle should apply to the current spouse of the payee." *Street*, 325 Ill. App. 3d at 114. The court explained:

"To the extent that the current spouse of the payee has income or assets which are or can be used to contribute to the living expenses of the payee, his or her income and assets should be considered by the court in making its determination regarding the amount the payee is able to contribute to the child's education. Certainly, we are not saying that the new spouse of a parent is obligated to pay for the child's education, but only that to the extent the new spouse contributes to the expenses which would otherwise be paid by the parent, the new spouse's income and assets are relevant." *Street*, 325 Ill. App. 3d at 114.

Accordingly, the court followed *Drysch* and held that "failing to consider Carl's income and assets to the extent they are or can be used to contribute to Linda's expenses constitutes an abuse of discretion." *Street*, 325 Ill. App. 3d at 114-15. The court remanded the matter for additional discovery regarding Carl's income and assets and ordered further hearings as to Linda's ability to contribute to college expenses. *Street*, 325 Ill. App. 3d at 115.

¶ 39    In rejecting Daniel's second argument–that the trial court erred in ordering him to contribute to the cost of private schooling–the court in *Street* noted that Daniel's assets were greater than the assets owned solely by Linda. *Street*, 325 Ill. App. 3d at 116. According to the court, while the trial court was to consider Carl's income and assets, it could do so only "to the extent that they assist Linda in paying her monthly expenses and free up some of her income for assisting [the child]." *Street*, 325 Ill. App. 3d at 116. The court rejected the notion that Carl's income and assets should be considered in determining Daniel's ability to contribute toward college expenses. *Street*, 325 Ill. App. 3d at 116.

¶ 40    Several cases have subsequently reinforced *Street*'s approach to considering a new spouse's income for purposes of section 513. In *Cianchetti*, the father argued that the trial court erred in ordering him to pay 50% of his two daughters' college expenses. *Cianchetti*, 351 Ill. App. 3d at 833. In its analysis, the court noted that the trial court could properly consider the "significant support" that the mother's new husband offered, which made much of the mother's own $42,000 annual income "disposable." *Cianchetti*, 351 Ill. App. 3d at 835. Citing *Street*, the court declared that "[a]lthough [the mother's] new husband is not obligated to pay for her children's tuition, and his income should not be used to determine her ability to pay tuition, it is properly used to examine the extent to which her income can be freed through reliance on her husband for support." *Cianchetti*, 351 Ill. App. 3d at 835 (citing *Street*, 325 Ill. App. 3d at 114). Similarly, in *In re Marriage of Deike*, 381 Ill. App. 3d 620 (2008), which involved a judgment of dissolution providing that each parent was responsible for 50% of the children's college expenses, the court stated: "As with any other form of child

support, a trial court can consider the parties' assets and other elements of financial resources, even the financial status of a current spouse, to determine whether payment of support would endanger the ability of the support-paying party and that party's current spouse to meet their needs." *Deike*, 381 Ill. App. 3d at 627 (citing *In re Marriage of Keown*, 225 Ill. App. 3d 808, 813 (1992)).

¶ 41 The present matter is distinguishable from the above cases, because Jennifer is a stay-at-home mother who relies on her new husband for just about all of her financial support. Furthermore, unlike the mothers in *Drysch* and *Street*, Jennifer testified that she did not have access to Tim's accounts and that she and Tim did not have any joint accounts.

¶ 42 Nevertheless, we find the above cases to be instructive. One of the reasons for our decision in *Drysch* was the need to consider the new husband's income to get a complete picture of the mother's financial resources. Another reason articulated was not to allow the mother to shield some of her financial resources from the court's consideration. *Drysch*, 314 Ill. App. 3d at 645. These same concerns are present in this case. Section 513 allows the trial court to "award sums of money out of the property and income of either or both parties." 750 ILCS 5/513(a) (West 2012). While Jennifer earns no income, she does have certain property, however minimal, including a home, which she owns jointly with her husband; a life insurance policy with a surrender value of $4,272.61; IRAs and a retirement annuity worth $38,072.58; and bank accounts worth $2,400 at the time of the hearing. It was therefore necessary and appropriate for the trial court to consider Tim's income to the extent that his assistance frees up Jennifer's own assets for contribution. As in *Drysch*, to hold otherwise would allow Jennifer to shield resources from the court's consideration.

¶ 43 However, the court should not have used Tim's income as the baseline for determining Jennifer's contribution toward M.M.'s college expenses. In other words, we find no basis in *Drysch* and its progeny for the court to impute Tim's income to Jennifer. By doing so, the court effectively shifted the burden to Tim to pay for M.M.'s college expenses, something that he has no legal obligation to do. See *Drysch*, 314 Ill. App. 3d at 645 (noting that the traditional rule–that the financial status of a current spouse should not be considered–"developed because the new spouse has no legal obligation for the support of his stepchildren"). Consequently, the court's allocation of responsibility for college expenses, which was premised on imputing Tim's income to Jennifer, was erroneous.

¶ 44 To the extent that the trial court's order could be construed as imputing income to Jennifer on some other basis, this was also improper, absent the necessary factual findings. "The imputation of income arose in response to noncustodial parents who experienced a reduction in income and sought a corresponding decrease in child support. When the custodial parent questioned the motives of the payor, courts answered by imputing income when appropriate." *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1077 (2009). In order to impute income to a party, the court must find that the party is voluntarily unemployed, is attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity. *Gosney*, 394 Ill. App. 3d at 1077. "[I]f a court finds that a party is not making a good-faith effort to earn sufficient income, the court may set or continue that party's support obligation at a higher level appropriate to the party's skills and experience." *In re Marriage of Sweet*, 316 Ill. App. 3d 101, 107 (2000); see also *In re Marriage of Pratt*, 2014 IL App (1st) 130465, ¶ 26 ("[I]n determining income for child support purposes, the trial court has the authority to compel a party to pay at a level commensurate with his earning

potential. [Citation.] If present income is uncertain, the trial court may impute income to the payor.”). In the present case, the trial court did not impute income to Jennifer in an amount commensurate with her own skills and experience. Instead, it imputed Tim's income to her. There was no evidence to support a conclusion that Jennifer could earn approximately $130,000 per year, as Tim does, if she reentered the workforce. Therefore, to the extent that the court imputed income based on Jennifer's voluntary unemployment, it erred in not determining an amount commensurate with her skills and experience. Nor did the court find that Jennifer was attempting to avoid a support obligation or that she had forgone an employment opportunity.

¶ 45   We recognize that we review the trial court's judgment, not its reasoning, and that we may affirm on any basis in the record. See *In re Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 33 (“ ‘[T]his court is not bound by the trial court's reasoning and may affirm on any basis supported by the record, regardless of whether the trial court based its decision on the proper grounds.’ ” (quoting *Mutual Management Services, Inc. v. Swalve*, 2011 IL App (2d) 100778, ¶ 11)). However, we cannot ascertain from the record whether the trial court would have ordered Jennifer to contribute the same amount toward college expenses had it not imputed Tim's income to her. Accordingly, we reverse the July 17, 2014, order and remand for further proceedings consistent with this opinion. In its discretion, the trial court may, but need not, hear additional evidence or argument, or both.

¶ 46                                   III. CONCLUSION

¶ 47   The judgment of the circuit court of Du Page County is reversed, and the cause is remanded with directions.

¶ 48   Reversed and remanded with directions.