NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 210081-U

NO. 4-21-0081

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 7, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* R.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
|     Petitioner-Appellee, | ) | No. 20JA63 |
|     v. | ) | |
| LaTwinkle M., | ) | Honorable |
|     Respondent-Appellant). | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the trial court's finding that the minor was neglected because the finding was not against the manifest weight of the evidence.

¶ 2     Respondent, LaTwinkle M., is the mother of R.D. (born March 2016). In July 2020, the State filed a petition for adjudication of wardship, alleging R.D. was a neglected minor in that she lived in an environment injurious to her welfare when living with respondent because (1) respondent left R.D. unsupervised, (2) respondent could not find adequate caregivers when she was arrested, and (3) respondent's home was unclean. See 705 ILCS 405/2-3(1)(b) (West 2018). In January 2021, the trial court adjudicated R.D. a neglected minor.

¶ 3     In February 2021, the trial court conducted a dispositional hearing, adjudicated the minor a ward of the court, and placed guardianship of the child with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 4    Respondent appeals, arguing that the trial court's adjudication of R.D. as a neglected minor was against the manifest weight of the evidence. We disagree and affirm.

¶ 5                                    I. BACKGROUND

¶ 6                                    A. The Petition

¶ 7    In July 2020, the State filed a petition for adjudication of wardship requesting R.D. be made a ward of the court and adjudicated a neglected minor. The petition alleged the grounds for a neglect finding, as follows:

> "a. On July 18, 2020, the mother of this 4-year-old minor was arrested on an arrest warrant out of Cook County, IL for the charge of delivery of heroin. The mother and minor were located in the family home at [street address], Quincy, Illinois. The home was observed to be filthy with piles of garbage and junk, including cigarette butts, throughout the home. The minor's skin and clothing were very dirty including body odor. A blowup swimming pool, that was leaking, was in the middle of the living room. When the minor was taken into limited custody, she reported that her mother leaves her alone while she goes to the store and that she gets under the blankets and prays because she is scared.
>
> b. There were no relatives willing or available to take custody of the minor. The mother did not provide accurate information regarding possible other placements including with the child's father ***. The mother stated she came to Quincy, IL to get away from the abusive relationship she was in with [father]."

¶ 8    Also in July 2020, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of DCFS.

¶ 9                                    B. The Adjudicatory Hearing

¶ 10        In January 2021, the trial court conducted an adjudicatory hearing.

¶ 11                                1. *The State's Evidence*

¶ 12        The State offered a copy of a Cook County warrant into evidence. The warrant was filed July 14, 2020, fixed bond at $25,000, and alleged the offense of delivery of less than one gram of heroin. The warrant stated that the offense was committed on March 1, 2019. The trial court admitted the warrant into evidence over respondent's objection.

¶ 13        Zachary Bemis testified that he was a patrol officer with the Quincy Police Department. On July 18, 2020, Bemis traveled to respondent's residence at about 11 p.m. to arrest respondent based on a warrant for delivery of heroin issued by Cook County. Bemis stated respondent was standing outside directly in front of her front door when he arrived.

¶ 14        Bemis testified that he informed respondent of the warrant and told her to call or make arrangements for someone to watch any children that were with her. Respondent stated she had R.D. with her but did not have anyone in the Quincy area who could pick her up. Bemis testified that the door opened and R.D. appeared in the doorway. Bemis could see into the home and noted that there was a blow-up pool in the living room and standing water on the hardwood floors. Bemis stated he then left the premises briefly to assist on another call. He returned with another officer and placed respondent under arrest.

¶ 15        Bemis testified that he entered the home to lock it up. Upon entry, Bemis noticed the following: "There was standing water, there was some garbage on the floor, there was also a mattress in a room that was laying on the floor, had a bunch of garbage on top of it, and then there was also another room that had cigarette butts and ash all over the floor and garbage all over." Bemis stated R.D. was taken to the police department and "[h]er clothes appeared to be dirty and I could smell what I perceived to be dried urine from her." Bemis further stated that

R.D. "[s]aid she doesn't want her mom to leave her alone anymore inside the apartment. I asked her if she gets left alone often. She said that her mom will leave her and she's home by herself and she gets scared." Bemis testified he then called DCFS to make a report.

¶ 16    Michael Hugenberg testified that he was an investigator for DCFS. On July 18, 2020, Hugenberg was assigned to investigate allegations of inadequate supervision and environmental neglect of R.D. Hugenberg stated that inadequate supervision was "indicated" by DCFS as a result of his investigation.

¶ 17    Hugenberg went to the police department and met with R.D. at about 11:40 p.m. Hugenberg noticed "[R.D.] was in dirty clothes, was unkept, and did have an odor to her." Hugenberg took R.D. into protective custody. Hugenberg met with respondent the next day at the Adams County jail. Respondent "reported that she was having issues in Chicago. I remember specifically she referred to it as drama in Chicago so she came to Quincy about six to nine months ago." Respondent could identify only two people to potentially provide care for R.D.: R.D.'s father and respondent's mother. Hugenberg stated that he could not use either as an option because "[respondent] didn't give accurate information like dates of birth on those people and when we were making a decision about that, we found out more—more of [respondent's] prior history with the Department."

¶ 18    Hugenberg testified that on July 30, 2020, respondent called him and stated she had been released from Cook County jail and had returned to Quincy. Respondent (1) denied the allegations in the warrant, (2) stated it was an old charge and it would be dropped at the next court date, and (3) "reported the relationship with the child's father was abusive, physically and emotionally." Respondent also denied leaving R.D. alone at home.

¶ 19    The State asked Hugenberg for the reasons he and his supervisor decided to take

R.D. into protective custody. Hugenberg answered as follows:

> "That mother was in jail and was unable to bond out. It was concerns about what her charges were which were for delivery of a controlled substance. She also had a—she was unable to make any care plan for the child in Quincy. And then she also had a prior indicated report in 2019 for inadequate supervision. [R.D.] had told the police officer earlier that night that she is left at home alone and is scared and the police officer, when he arrived at the home, found the home to be in a relatively hazardous condition."

¶ 20    Hugenberg testified that he visited respondent at her home "about a month later." On that occasion, Hugenberg did not "observe anything unusual or concerning about the home." Hugenberg stated that the allegation of "environmental neglect" was "unfounded."

¶ 21                    2. *The Respondent's Testimony*

¶ 22    Respondent testified mostly consistently with Bemis and Hugenberg. Respondent stated Bemis did not allow her the opportunity to call anyone when she was arrested. Respondent further stated that she had a friend who lived on the same street that could have watched R.D. Respondent testified that she informed Hugenberg about this friend.

¶ 23                    3. *The Trial Court's Findings*

¶ 24    The trial court found it had jurisdiction over the parties and the subject matter. Regarding the warrant, the court stated "the most that is known from that exhibit that's been shown here today was that on or about July the 14th of 2020, there was a warrant issued for the mother from Cook County, Illinois alleging an offense of unlawful delivery of a controlled substance. That's—that's the most that we know from that exhibit." Regarding the statements allegedly made by R.D., the court stated it "does not have to consider and is not considering any

of those statements, which were made by the minor."

¶ 25    The trial court concluded as follows:

> "Beyond that, the People had withdrawn paragraph 3(c) of the petition [alleging neglect based on prior 'indicated' findings by DCFS] at the beginning of this case so we're left with paragraphs 3(a) and (b) in the petition. The Court would find that each of the allegations in those paragraphs with the exception of the alleged statements of the minor have been proven by a preponderance of the evidence. The Court does not have to consider any statements from the minor in making those findings.

> Based upon those allegations being proven, the Court would find that they do fit into one or more of the definitions of a neglected minor under the Juvenile Court Act and the Court can make that finding here today finding that the petition has been proven with regard to those allegations."

¶ 26                          C. The Dispositional Hearing

¶ 27    In February 2021, the trial court conducted a dispositional hearing at which it entered a written order finding that it was in the best interest of R.D. and the public that the minor be made a ward of the court and adjudicated a neglected minor. The court further found respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline R.D. and it would be contrary to R.D.'s health, safety, and best interest to be in respondent's custody. The court placed guardianship and custody with the guardianship administrator of DCFS.

¶ 28    This appeal followed.

¶ 29                                II. ANALYSIS

- 6 -

¶ 30　　　　　Respondent appeals, arguing that the trial court's adjudication of R.D. as a neglected minor was against the manifest weight of the evidence. We disagree and affirm.

¶ 31　　　　　　　　　　　　　　A. The Law

¶ 32　　　　　The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)) provides a systematic framework for determining when a minor can be removed from his or her parents and made a ward of the State. *In re A.P.*, 2012 IL 113875, ¶ 18, 981 N.E.2d 336. A trial court must make a finding of abuse, neglect, or dependence regarding a minor before it can adjudicate the minor a ward of the court. 705 ILCS 405/2-10 (West 2018). If a trial court finds a minor is neglected, then the court holds a dispositional hearing at which the "court determines whether it is consistent with the health, safety and best interests of the minor and the public that the minor be made a ward of the court." *A.P.*, 2012 IL 113875, ¶ 21.

¶ 33　　　　　The Illinois Supreme Court has described an adjudication of neglect based on an injurious environment as follows:

> "[A] neglected minor includes any minor under 18 years of age whose environment is injurious to his or her welfare. [Citation.] Generally, neglect is defined as the failure to exercise the care that circumstances justly demand. ***
> [Citation.] This does not mean, however, that the term neglect is limited to a narrow definition. [Citation.] As this court has long held, neglect encompasses willful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes. ***
> [Citations.] Similarly, the term injurious environment has been recognized by our courts as an amorphous concept that cannot be defined with particularity.

[Citation.] Generally, however, the term injurious environment has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. [Citations.]" (Internal quotation marks omitted.) *A.P.*, 2012 IL 113875, ¶ 22.

¶ 34 "On appeal in a juvenile proceeding, a reviewing court will not reverse a trial court's determination of abuse or neglect unless it is against the manifest weight of the evidence." *In re An. W.*, 2014 IL App (3d) 130526, ¶ 55, 17 N.E.3d 878. "A finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion." *Id.* "Under the manifest-weight-of-the-evidence standard, a reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." (Internal quotation marks omitted.) *In re Parentage of W.J.B.*, 2016 IL App (2d) 140361, ¶ 25, 68 N.E.3d 977.

¶ 35                                    B. This Case

¶ 36 Given our deferential standard of review, we conclude that the trial court's finding of neglect based on an injurious environment was not against the manifest weight of the evidence. Although not considered by the trial court, R.D.'s statements about being left home alone were admitted into evidence and fall squarely within the excited utterance exception to the hearsay rule. Ill. R. Evid. 803(2) (eff. Sept. 28, 2018). It is well settled that this court may affirm a trial court's judgment on any grounds supported by the record. *In re Parentage of M.M.*, 2015 IL App (2d) 140772, ¶ 45, 29 N.E.3d 1197.

¶ 37 Although section 2-18(4)(c) of the Juvenile Court Act provides, "[N]o such statement, if uncorroborated and not subject to cross-examination, shall be sufficient *in itself* to

support a finding of abuse or neglect," (emphasis added) (705 ILCS 405/2-18(4)(c) (West 2018)), that statute does not mean an excited utterance would not be admissible or that it could not be considered together with other evidence.

¶ 38    Here, the conditions described by Hugenberg and Bemis support the inference that R.D. was living in an injurious environment when staying with respondent. Both witnesses stated that R.D. was dirty, wore soiled clothes, and had strong body odor. Bemis testified that R.D. had an odor of dry urine and appeared not to have bathed in several days. Respondent herself was also dirty and smelled of body odor.

¶ 39    Further, Bemis testified that he saw only a single mattress in the home and it was covered with garbage. Bemis described the home as "filthy" and described trash and "junk" being strewn on the floors throughout the home, including lots of cigarette butts. Moreover, an inflatable pool filled with water was leaking in the middle of the living room. Although Hugenberg testified that nothing in the home gave him any cause for concern when he met with respondent about a month after R.D. was taken into care, the trial court could have easily inferred that the conditions in which R.D. was found (dirty and soiled) were the norm and the state of the house during the scheduled visit was remedial. In any event, authorities do not have to observe this type of situation on multiple days in order to act.

¶ 40    Given this context, we cannot say that the opposite result was clearly warranted. Accordingly, we conclude that the trial court's finding was not against the manifest weight of the evidence.

¶ 41                                III. CONCLUSION

¶ 42    For the reasons stated, we affirm the trial court's judgment.

¶ 43    Affirmed.