2020 IL App (2d) 190839-U
No. 2-19-0839
Order filed June 26, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF PAUL J. N., | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 05-D-1471 |
| ANN SCHEURMANN, | ) ) ) | Honorable Joseph Grady, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Birkett and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court properly discharged ex-wife's petition for indirect civil contempt against ex-husband when the evidence showed that ex-husband's technical violation of a 2009 court order was not willful or contumacious. The court also properly imputed income to ex-wife when the evidence demonstrated that she was underemployed and that she was attempting to evade a support obligation. The trial court correctly ordered ex-wife to pay forty percent of the parties' son's college expenses when there was sufficient evidence that the ex-wife had the resources to do so. Finally, the trial court did not err in ordering ex-wife to pay $5000 of ex-husband's attorney fees when the evidence showed that she brought the petition for indirect civil contempt against ex-husband in retaliation for ex-husband filing a petition to have ex-wife contribute to their son's college expenses.

¶ 2    Respondent Ann Scheurmann appeals from a post-dissolution decree that ruled in favor of her ex-husband, petitioner Paul N. Specifically, Ann argues that the trial court erred in: (1) denying her petition for a Rule to Show Cause as to why Paul should not be held in indirect civil contempt; (2) ordering her to pay 40 percent of her son's college expenses; and (3) *sua sponte* ordering her to pay $5,000 towards Paul's attorney fees. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Paul and Ann were married on August 10, 1995. On August 12, 1998, they had a son, P.N. On May 18, 2007, their marriage was dissolved after a contested trial. Paul was given residential custody of eight-year-old P.N., but the parties had equal parenting time. The issue of child support was reserved based upon the extensive amount of time each parent spent with P.N. at the time. Paul was ordered to get an appraisal of a home that the parties owned in Ontario, Canada, and to split the equity in the home equally.

¶ 5    In 2008, Ann moved from Kane County, Illinois to Canada. On July 14, 2008, Paul filed a petition to establish a support trust for P.N. His petition noted that the dissolution order required neither party to pay child support. However, Ann's move to Canada had resulted in changed circumstances that substantially affected the parties' obligations to pay for P.N.'s expenses. Paul therefore asked that statutory child support be awarded to him. He also asked the court to set up a support trust to protect P.N.'s best interests and provide for his educational, medical and extracurricular expenses. Paul alleged that Ann had already been found in contempt of court for dishonoring her obligation to pay her share of P.N.'s expenses and her recalcitrance continued in that regard. Paul noted that under the terms of the dissolution agreement, Paul still owed Ann $17,500, minus $3,480 from an earlier court order that granted Paul a fee petition and a reimbursement for guardian *ad litem* fees. Therefore, Paul requested that the court apply the

outstanding amount, $14,020, as an offset to be placed in the support trust for the benefit of Paul's expenses.

¶ 6    On December 11, 2009, the trial court reserved ruling on the petition pending Ann's re-employment in Canada. The court did, however, allocate the remaining $14,020 due to Ann to Paul to use for P.N.'s medical and other expenses. The order provided that copies of receipts for expenses for which Paul sought reimbursement be tendered to Ann before Paul withdrew the reimbursement amount. The order also required Ann to make her best efforts to seek and obtain full time employment. On February 24, 2009, the court ordered that Ann pay Paul $140 per week as ongoing child support for P.N.'s support. That order also required that copies of receipts and proof of payment be tendered to Ann prior to Paul removing Ann's half of P.N.'s expenses from the trust.

¶ 7    On September 11, 2017, Paul filed a petition requesting that Ann be ordered to contribute toward P.N.'s educational expenses for attending Waubonsee Community College (Waubonsee) in Sugar Grove, Illinois. On March 14, 2018, Ann filed a petition for indirect civil contempt alleging that Paul violated the February 24, 2009, support trust order by failing to provide her with receipts for funds drawn from the trust before withdrawing those monies. On July 25, 2018, Paul filed a second petition for contribution toward P.N.'s post-secondary educational expenses. In that petition Paul noted that P.N. had attended Waubonsee for the 2017-2018 school year. The expenses for that year had been resolved by court order that Ann, Paul, and P.N. each paid one-third of those expenses. Paul alleged that P.N. intended to enroll in Estrella Mountain Community College for the 2018-2019 school year. Paul requested that the court enter an order apportioning responsibility for college contributions from 2018 going forward.

¶ 8      On July 9, 2019, the court held a hearing on Ann's petition for a rule to show cause why Paul should not be held indirect civil contempt for violating the terms of the February 24, 2019, order. Ann called Paul as an adverse witness. Paul testified that the child support trust was held by him for the benefit of Ann for payment of Ann's one-half share of P.N.'s expenses. The trust also provided that all copies of receipts and proof of payment were required to be tendered to Ann before he could remove any money from the trust. When asked whether he ever took the $14,020 and put it into a separate trust, Paul said that there was physically no $14,020, so he did not open a separate account. Paul said that the $14,020 was a credit due to Ann and the court did not order him to set up such an account.

¶ 9      Paul testified that in February 2009 he sent Ann an email and said he was going to set up a Google Drive account where he would upload P.N.'s expenses. He sent Ann the link to that account. Paul told Ann that he was going to upload receipts to that document. However, after he sent that email, he realized that he could not attach receipts to the spreadsheet. He did not send Ann a follow up email telling her that he was not going to upload the receipts to that link. Instead, he sent Ann receipts via email. At one point he listed a $100 expense for P.N.'s basketball camp and Ann objected. Paul asked her why she objected, and Ann said, "I can't. Financially I can't." Paul did not respond to Ann's comment and he noted her half of that expense on the spreadsheet. Paul thought that he stopped sending Ann any receipts around September 2009. He could not recover any more emails from that period to turn over in discovery. He did not send receipts for every line item that constituted a recurring expense like medical copays. After September 2009 Paul said that Ann only had to click on the spreadsheet, which was very detailed, and see could see a day-by-day account of all of P.N.'s expenses up until there was a zero balance in 2014.

¶ 10    On cross-examination by his counsel, Paul said he created the spreadsheet because he thought that it was the simplest way to communicate with Ann. She could click on it as many times as she wanted daily for an update. When he initially sent Ann the email explaining to her that he had set up a spreadsheet in Google Drive, she responded sometime later and said, "[t]he information in your Google drive spreadsheet is not correct." After that email Ann never sent him any objection to using the Google Drive spreadsheet to notify her of P.N.'s expenses. If Ann or her boyfriend ever specifically asked for a receipt it was his recollection that he provided it.

¶ 11    Paul said that of the 12 times that he had been in court regarding post-decree issues since their divorce, Ann never requested to see the receipts of payments for P.N.'s expenses. If Ann wanted to verify any of the expenses, she could have contacted P.N.'s school or his coaches, for example. Paul said that it was never his intention to violate any court order. He only wanted to follow the order and move on with his life and take care of P.N.

¶ 12    On re-direct Paul admitted that he did not follow the terms of the court's order when he did not provide proof of payment and copies of receipts for some of the expenses. He agreed that there was no court order requiring Ann to review his spreadsheet of expenses.

¶ 13    Ann testified that after the order was entered to set up a trust for P.N.'s expenses Paul sent her emails to demonstrate where the money was being spent. However, he never sent her anything to show her where the money was located. He never told her if the money was segregated from the rest of his money. It was her understanding that Paul was required to notify her of P.N.'s expenses and send her the receipts as proof of payment. She received an email from Paul in February 2009 stating that he was setting up a spreadsheet of P.N.'s expenses. That spreadsheet spanned from January 2008 until December 2014. Ann testified that she attempted to open the link

to the spreadsheet that Paul sent her, but she was not able to open it. She tried to tell Paul that she could not open the link and then she spoke to her lawyer about it.

¶ 14    Ann said that Paul never told her that he could not upload the receipts to the spreadsheet. She received emails from Paul where he had attached copies of receipts of P.N.'s expenses. Although she objected to Paul spending money on P.N.'s basketball camp, that expense was incurred despite her objection. She may not have responded to some of Paul's emails; she did not remember. At some point Paul stopped sending emails with receipts of P.N.'s expenses. Ann said that she was also paying Paul $140 a week in child support. She did not think that Paul was incurring expenses for P.N. after September 2009 when she no longer received any emails with receipts; she thought that child support was covering the expenses and did not question it.

¶ 15    Ann said that she did not receive any communication from Paul in December 2014 or at any time thereafter that the money in the trust had been depleted. It was only when Paul filed his motion for contribution to P.N.'s college expenses did she learn that there was no money left in the trust. Had Paul told her after September 2009 that P.N. was going to incur additional expenses, her share of which would be taken out of the trust, Ann would have been put on notice and had an opportunity to question those subsequent expenses. If that were the case Ann would have come to court to address that issue.

¶ 16    Ann could not tell from the spreadsheet if Paul had actually paid any of the listed expenses. Regarding medical expenses, she would not know if Paul put a bill that was listed on the spreadsheet through his insurance and had later been reimbursed for that expense. Ann thought that Paul set up the trust because he did not trust her to pay for P.N.'s expenses.

¶ 17    On cross-examination, Ann testified that she would have no way of knowing whether P.N. did not attend school, participate in activities, or went without insurance for the last ten years.

Regarding the spreadsheet, Ann understood that she could access the Google Drive as many times as she liked every day of the year. If she were curious about whether the trust fund was exhausted, she could have just looked at the spreadsheet. She said that she had tried to open the spreadsheet, but was unable to do so. She did not remember when she tried to open it up because it was hard to remember back to 2009. She did not have an email from her to Paul asking him to resend the link. She said that her live-in boyfriend and she both tried to open the link but could not do so. Ann then admitted that she was able to access the spreadsheet in March 2009, when she sent Paul an email saying that she disagreed with its contents.

¶ 18    Ann had no information about P.N.'s medical bills from 2015 through 2017. When Paul's counsel told her that was not true because the Ontario Family Responsibility Office (OFRO) sent her statements showing all of P.N.'s medical bills, Ann said that her boyfriend dealt with the OFRO. Ann then admitted that she did receive those statements but that she did not pay them. Finally, she conceded that she did not file any motions in court between 2009 and 2019 objecting to Paul using the Google drive spreadsheet.

¶ 19    On re-direct Ann said that she never told Paul he did not have to send her any more receipts for P.N.'s expenses. P.N.'s medical bills that she received from the OFRO were not notifications that she was financially responsible for those bills. The OFRO paid those bills with money that they had taken from Ann for arrearages and other expenditures related to P.N.'s expenses.

¶ 20    Regarding the spreadsheet, Ann said that she could open it at one time and see the spreadsheet, however another time she tried to open it but could not. She believed that she tried to have a conversation with Paul about her inability to access the spreadsheet. However, she did not have an email to Paul where she told him that she could not access the spreadsheet.

¶ 21 On July 10, 2019, the court held a hearing on Paul's petition for Ann to contribute to P.N.'s college expenses. Paul testified that he currently lived in Goodyear, Arizona. P.N. attended Arizona State University (ASU) in the spring 2019 school semester. He was currently taking summer courses at the local community college, and he planned on returning to ASU for the fall 2019 semester. P.N. had expressed an interest in civil engineering. He had a 3.69 grade point average for the spring 2019 semester. Before he started at ASU in January 2019, P.N. had attended community college in Illinois and Arizona. He was on track to graduate in three more years in the spring of 2022. P.N. was planning to live on campus in a private apartment complex with other ASU students. He will also have an ASU meal plan. He works part-time as a waiter at a local restaurant and he receives minimum wage plus tips. Paul testified that for his first semester at ASU, P.N.'s expenses were around $11,000 including tuition, a meal plan and the dormitory fees. Paul paid those fees in full; Ann did not contribute in any way.

¶ 22 Paul was a product engineer for a medical device company. His base salary is $105,000 per year plus a bonus. Last year his bonus was $15,000. He took six percent out of his wages and put it into a 401(k) and his employer added an additional three percent into that account. He also made around $8000 from selling items on eBay.

¶ 23 Paul testified that since 2014 Ann had not contributed any money for P.N.'s medical or extracurricular expenses. As of the date of the hearing Ann owed him around $8000 for those expenses. Itemized receipts of those expenses were admitted into evidence. Paul did not hold Ann responsible for any of P.N.'s expenses after he turned 18 years' old. Paul had come into court 12 times in the past to collect past arrearages from Ann.

¶ 24 On cross-examination Paul said that from 2015 forward he did not send anything to Ann; instead, he sent proof of expenses directly to the OFRO.

¶ 25    On re-direct, Paul agreed with his counsel that Ann had "checked out" of P.N.'s life when he was 10 years' old. Paul said that he was extremely proud of P.N. and that he was on track toward academic success. When asked why he did not send the bills from the community colleges and ASU directly to Ann instead of sending them to the OFRO, Paul said that given Ann's prior history of never paying for anything for P.N. voluntarily and the fact that the OFRO said they could collect money for college expenses if it was given a court order, he felt it was the most logical way to get paid.

¶ 26    On re-cross examination, Paul agreed that Ann had been paying him child support for P.N. from 2010, but only because of an order from the Canadian government to pay child support or lose her driver's license.

¶ 27    Ann testified that she lived in Canada with her boyfriend and their daughter, Catherine. Her boyfriend owned the home and she had no interest in it. Ann was a registered dental hygienist. When she lived in the United States and was married to Paul, she worked 25 to 30 hours per week as a hygienist. According to Ann, her ability to earn income was greater in the United States than it was in Canada. The exchange rate in Canada was about $1.30 for every United States (U.S.) dollar. So, to pay $1 in U.S. money she would have to earn $1.30 in Canadian currency. In addition to the exchange rate there is a service fee to convert Canadian currency to U.S. currency.

¶ 28    When Ann was ordered to pay $140 a week in child support in 2009 that number was based upon an imputed income of $700 per week. Annually, her imputed gross income was $50,000.[1]

_____

[1] The record reflects that two years before Ann was ordered to pay child support for P.N. based upon an imputed yearly income of $50,000, in a judicial letter dated April 13, 2007, the court noted that the evidence showed Ann worked 25 to 30 hours per week and earned $52,000

When she moved to Canada, she continued to work 25 to 30 hours per week until two months ago. She was working as an independent contractor and filling in for someone who was on maternity leave, and when that person came back to work Ann's hours were decreased to one day a week. She was currently seeking additional work from other dentists. Generally, she earns 40 Canadian dollars per hour.

¶ 29    On Ann's financial affidavit she listed an account through Empire Life that had a balance of $256,000. She inherited that money when her mother died. She was the executor of her mother's estate and she earned around $33,000 for that role. She also received an additional $70,000 to offset the same amount that her mother had given her brother before she died. The estate was then divided between she and her brother, and she received an additional $250,000. Ann said that the $256,000 in the Empire Life account was a restricted investment account for her daughter. She created that account for her daughter based upon her mother's wishes. She did not have access to those funds. However, she then said that if she withdrew those funds, she would have to withdraw the entire amount and she would pay around a 35 percent penalty.

¶ 30    Ann said that she had already spent her $33,000 executor's fee and the additional $70,000 she had received from her mother's estate. She had an interest in a website that sold vitamins, but she had yet to turn a profit. Ann testified that she had no objection to contributing to P.N.'s college expenses. She only wanted the court to allocate her obligation based upon what was fair under the circumstances. Ann understood that Paul was also seeking to be reimbursed for P.N.'s expenses from 2015 through 2017, but she did not receive any proof of payment for those expenses. The

---

per year. Ann testified that if she worked 30 hours per week, she would make upwards of $57,000 per year, and if she worked 40 hours per week, she would earn upwards of $75,000 per year.

first time she heard about the expenses for those years was when Paul submitted them to the OFRO. However, the OFRO removed those arrearages from her account because Paul did not have a court order requiring her to pay those expenses.

¶ 31 On cross-examination, Ann said that she did not know that P.N. had medical needs or school fees and various costs from 2015 to 2017. She also did not know that P.N. had health insurance, but presumed that he attended school during that time. Ann admitted that the only way that Paul had gotten child support from her was though the OFRO and that she was not paying child support voluntarily.

¶ 32 Regarding the restricted account, Ann admitted that although it was her mother's wish to put that money in trust for her eight-year-old daughter Catherine, there was nothing in her mother's will to that effect. She also admitted that the account was still in her name. She denied that she was trying to shelter that money from the current court proceeding. On re-direct examination, Ann said at the time she set up the account for her daughter there was no petition on file for her to contribute to P.N.'s educational expenses.

¶ 33 The court then asked both parties' attorneys how ASU's costs compared to that of the University of Illinois (U of I). Ann's attorney said that the cost to attend U of I was around $35,000 per year. Paul's attorney said that the cost to attend ASU was around $22,000 per year.

¶ 34 The proceedings were then recessed for the day. The parties later tendered proposed judgments to the court and closing arguments were heard.

¶ 35 On August 30, 2019, the trial court entered its order. The court first denied Ann's petition for indirect civil contempt against Paul. It noted that Paul had created the Google Drive spreadsheet in 2009, and Ann had failed to raise any objection to Paul's method of making the bills for P.N.'s expenses and proof of payments of those expenses available to her. Therefore, Ann's lack of

objection indicated her assent to that procedure. Ann's delay in communicating any objection to this electronic procedure deprived Paul of the opportunity to provide Ann with the proof of payments in a timelier manner. The court found that Paul's method of providing Ann with bills and proof of payment was not a willful or contumacious disregard of the court's previous order.

¶ 36 The court also found that although monies held in trust are often held in a bank or investment account separate from other funds, there was no evidence that Paul used any of the $14,020 for any expenses other than P.N.'s, and Paul provided an ongoing and continuous accounting of those funds. The court noted that the $14,020 was exhausted as of December 1, 2014, and since that date Paul had expended an additional $15,953.82 and he had maintained a record of those expenses. Therefore, it found Ann's arrearage to be half that amount, or $7,976.91. Ann was ordered to pay that amount by October 22, 2019.

¶ 37 The court then addressed Paul's petition for Ann's contribution toward P.N.'s college expenses. It first noted that the cost of ASU was less than that of the U of I. It said that Paul's income was significantly higher than Ann's. Paul earned a net income of $103,500 and Ann earned a net income of $26,000 annually. Ann appeared to earn less than she did when she and Paul divorced, when she earned between $52,000 to $53,000. The court found that the account Ann set up for her daughter was created to shield it from creditors and from contributions to P.N.'s college expenses. It also found that each party had sufficient income and assets to contribute to P.N.'s post-secondary education. Paul had paid for most of P.N.'s post-secondary educational expenses thus far incurred, and the history of this case indicated that Ann would not contribute to P.N.'s expenses; she had not paid child support without the assistance and intervention of the Canadian government. The costs at ASU, including tuition, room and board and fees were around $13,700 per semester. P.N. still had six semesters to complete his degree at ASU. P.N. had maintained good

grades in college and was interested in pursuing an engineering curriculum. Therefore, the court found good cause to order the parties to contribute to his education. The court found that Ann was underemployed and it imputed income to her of $70,000 in U.S. dollars annually, or $17,000 U.S. dollars above what she earned at the time of the divorce in 2008. The court ordered the parties to each pay forty percent of P.N.'s post-secondary education and it set the cost of that education at $100,000 considering probable increases into the price of that education. P.N. was assessed the twenty percent balance of the cost of his education.

¶ 38    The court ordered Ann to pay 36 equal monthly installments of $1,111.11 in U.S. dollars, with the first payment due on October 1, 2019. The court granted Paul the right to file the order with the ORFO for enforcement in Canada for any payments that were not received by the due date. Ann was ordered to pay $5000 toward Paul's attorney fees, payable by October 31, 2019. Finally, the court noted that Ann raised an issue as to the difference in the value of the Canadian dollar versus the U.S. dollar. Considering the difference, the court noted that Ann had voluntarily relocated to Canada after the divorce, thereby assuming the risk of such a currency fluctuation. Ann timely appealed.

¶ 39                                    II. ANALYSIS

¶ 40    On appeal, Ann argues that the trial court abused its discretion in three ways: (1) denying her petition for a rule to show cause as to why Paul should not be held in indirect civil contempt in failing to properly administer the child support trust; (2) ordering her to pay 40 percent of P.N.'s college expenses; and (3) *sua sponte* ordering her to pay $5000 toward Paul's attorney fees.

¶ 41                      A. Petition for a Rule to Show Cause

¶ 42     Ann argues that the trial court abused its discretion when it did not find Paul in indirect civil contempt of court. Specifically, she notes that Paul admitted at trial that he did not put her $14,020 into a separate account even though he knew that he was to hold the funds as a trustee. He also failed to abide by the trial court's February 24, 2009, order when he failed to send Ann any receipts or proof of payments after September 2009. Ann claims that Paul should not have been a trustee over these assets and notes that the procedure of appointing a former spouse as a trustee had been strongly criticized by this court in *In re Marriage of Vucic*, 216 Ill. App. 3d 692, 702 (1991). Finally, in the last paragraph of her argument, Ann asks this court to reverse the trial court's arrearage award of $7,976 on the basis that she was unaware of those expenses.

¶ 43     Generally, civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party. *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). Contempt that occurs outside of the presence of the trial court is classified as indirect contempt. *Id.* The existence of a court order and proof of willful disobedience of that order are essential to any finding of indirect civil contempt. *Id.* The initial burden is on the petitioner to prove by a preponderance of the evidence that the alleged contemnor has violated a court order. *Id.* The burden then shifts to the alleged contemnor to show that noncompliance with the court's order was not willful or contumacious and that he had a valid excuse for his failure to follow the court order. *Id.* at 107-08. Contumacious conduct is "conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or lessening the authority and dignity of the court." *In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 349 (1992).

¶ 44     Whether a party is guilty of indirect civil contempt is a question for the trial court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or

the record reflects an abuse of discretion. *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984). As this court has noted, our supreme court "has never expressly abandoned the *Logston* standard." *In re Marriage of Barile*, 385 Ill. App. 3d 752, 759 n.3 (2008). The *Logston* rule "makes explicit a system of double deference to the trial court in contempt proceedings." *Chicago Shamrock Corp. v. Wroblewski*, 2019 IL App (1st) 182354, ¶ 29. If the trial court's factual findings are in dispute, we review the record and only reverse those findings that are against the manifest weight of the evidence. *Id.* If the trial court's factual findings are not in dispute or if those findings are consistent with the manifest weight of the evidence, we review the contempt order for an abuse of discretion, considering the relevant facts. *Id.*

¶ 45　　In her brief Ann cites to a few cases involving contempt, however, she has not provided this court with any citation to authority regarding the law on indirect contempt proceedings in this state. Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) requires that an appellant's brief contain "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Violations of Rule 341 can cause a party to forfeit an issue on appeal. *Kic v. Bianucci*, 2011 IL App (1st) 100622. Although we choose not to apply the forfeiture rule here, we strongly advise counsel to strictly comply with all Illinois Supreme Court Rules in the future. *Morse v. Donati*, 2019 IL App (2d) 180328, ¶ 16 (Illinois Supreme Court rules have the force of law and are not mere suggestions).

¶ 46　　The trial court properly discharged Ann's petition for indirect civil contempt when it found that Paul's conduct was not willful or contumacious. First, the February 2009 court order did not require that Paul put $14,020 in a separate account. As Paul noted in his testimony, the $14,020 was a *credit* due to Ann for her portion of the sale of their home in Canada; the actual cash did not exist. Second, while we agree with Ann that Paul did not technically adhere to the February 2009

order when he did not provide Ann with receipts or any other proof of payment for P.N.'s expenses after September 2009, Ann testified that she had accessed the Google Drive spreadsheet where he had listed these expenses on at least one occasion. Even though Ann testified that at one point she could not access the spreadsheet, her testimony was very inconsistent on this point and it was for the trial court to determine the parties' credibility. We agree with the trial court that Ann's failure to object to Paul's system of communicating with her regarding P.N.'s expenses deprived Paul of an opportunity to cure any such violation of the court order. Paul testified that it was never his intent to violate a lawful order of the court and he only created the Google Drive spreadsheet as a way to communicate with Ann regarding P.N.'s expenses and "move on" with his life. His conduct was not calculated to "embarrass, hinder, or obstruct a court in its administration of justice or lessening the authority and dignity of the court." (*In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 349 (1992)).

¶ 47    As for Ann's claim that Paul should not have been a trustee over these assets and that this court has frowned upon such a setup, Ann has long forfeited this claim for not raising it within 30 days of the February 24, 2009, trial court order that set up the child support trust. Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017) ("a notice of appeal must be filed within 30 days after the entry of the final judgment appealed from, or, if a timely posttrial motion directed against judgment is filed, within 30 days after the entry of the order disposing of the last pending postjudgment motion directed against that judgment or order").

¶ 48    Finally, we reject Ann's request to reverse the trial court's order that she pay $7976.91 in arrearages on the ground that she was unaware of those expenses. The evidence was clear that Ann had no interest in reviewing Peter's expenses since 2009 and, therefore, the trial court did not err when it ordered Ann to pay half of the itemized expenses from 2015 to 2017 that Paul presented

to the court. For all these reasons, the trial court properly discharged Ann's petition for a rule to show cause that Paul should be found to be in indirect civil contempt of court.

¶ 49                          B. Post-Secondary Education Expenses

¶ 50    Ann also contends that the trial court's order requiring her to pay forty percent of P.N.'s college expenses was an abuse of discretion and against the manifest weight of the evidence. Within this argument, Ann claims that the trial court erred in imputing $70,000 U.S. dollars annually to her, as well as refusing to consider the currency exchange rate between U.S. and Canadian dollars.

¶ 51    To impute income to a party, the court must find that the party is voluntarily unemployed, is attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity. *In re M.M.*, 2015 IL App (2d) 140772, ¶ 44. "[I]f a court finds that a party is not making a good-faith effort to earn sufficient income, the court may set or continue that party's support obligation at a higher level appropriate to the party's skills and experience." Id. (quoting *In re Marriage of Sweet*, 316 Ill. App. 3d 101, 107 (2000)). A trial court's finding regarding a party's net income, as it relates to a support obligation, will not be reversed unless it is an abuse of discretion. *In re Marriage of Breitenfeldt,* 362 Ill. App. 3d 668, 675 (2005). An abuse of discretion occurs when the court's ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. *In re the Marriage of LaRocque*, 2018 IL App (2d) 160973, ¶ 94.

¶ 52    Ann argues that the trial court failed to make the necessary findings to impute income to her and therefore the order must be reversed. We disagree. In its order the trial court specifically found that Ann was voluntarily unemployed. It also found that Ann's account containing $256,000, created solely for the benefit of her daughter, "may have been established to shield it from creditors

*and from the contributions to the post-secondary expenses of the child of the parties, who by at approximately the time [Ann] received the inheritance, the child of the parties was beginning his post-secondary educational career.*" Therefore, the court found that Ann engaged in two of the three types of conduct that would allow it to impute income to her—that she was voluntarily underemployed and that she was attempting to avoid a support obligation. See *In re M.M.*, 2015 IL App (2d) 140772, ¶ 44. These findings were supported by the evidence.

¶ 53    As for her underemployment, Ann testified that she regularly worked 25 to 30 hours per week in Canada until her employment contract lapsed. She also testified that ten years earlier, at the time of her divorce, she worked 25 to 30 hours per week during the parties' marriage. In the dissolution judge's letter opinion, which was made part of this record, the trial court noted that Ann was earning around $52,000 in 2007 as a dental hygienist working those same hours. That judge also found that Ann could earn up to $75,000 if she worked full time. Further, Ann's testimony that she only had an opportunity to work one day a week now because she was working for someone who had returned from maternity leave does not mean that she could not find other work as a hygienist. This is especially true since she testified that up until two months before the current hearing, she was working 25 to 30 hours per week. We find no error in the trial court's finding that Ann was voluntarily underemployed.

¶ 54    The evidence is also clear that Ann set up the account for her daughter to shield those assets from having to help her son pay for his college expenses. Ann testified that the account was set up for her daughter based upon her mother's wishes, but then she admitted that those wishes were not part of her mother's will. We agree with the trial court that it was not a coincidence that Ann set up that restrictive account just when she knew P.N. would soon be starting college. Accordingly,

the trial court did not abuse its discretion in imputing her income at $70,000, which was only some $18,000 higher than it was ten years ago at the time of her divorce.

¶ 55    Next, Ann argues that any support obligation assessed against her should be reduced commensurate with the exchange rate between the U.S. dollar and the Canadian dollar. This issue is without merit. We agree with Paul that Ann offered no credible evidence as to the exchange rate at trial other than her testimony. More important, Ann provided no authority in her brief as support for the proposition that a trial court errs when it refuses to consider a foreign conversion rate in its judgment. Accordingly, Ann has waived this argument. See IL S. Ct. Rule 341 (h)(7) (eff. May 25, 2018) (argument shall contain a citation of the authority relied upon).

¶ 56    We now turn to the propriety of the trial court's order requiring Ann to pay 40 percent of P.N.'s college expenses. Section 513 of the Illinois Marriage and Dissolution of Marriage Act (Act) pertains to educational expenses for non-minor children. 750 ILCS 5/513 (West 2018). Section 513(a) of the Act allows a court, in certain circumstances, to "award sums of money out of the property and income of either or both parties ***, as equity may require, for the educational expenses of any child of the parties." 750 ILCS 5/513(a) (West 2018). When awarding educational expenses, relevant factors to consider include: (1) the present and future financial resources of both parties to meet their needs, including, but not limited to, savings for retirement; (2) the standard of living the child would have enjoyed had the marriage not been dissolved; (3) the financial resources of the child; and (4) the child's academic performance. 750 ILCS 5/513(j) (West 2018). This court has interpreted "resources" in section 513(a)(1) of the Act to mean all the money or property to which a parent has access. *In re Marriage of Drysch*, 314 Ill. App. 3d 640, 644-45 (2000). This may include a parent's home, her property, or her investments. *Id.* at 645.

¶ 57    In reviewing orders allocating a child's college expenses pursuant to section 513 of the Act, courts have reviewed such decisions under an abuse of discretion standard as well as under a manifest weight of the evidence standard. *In re M.M.*, 2015 IL App (2d) 140772, ¶ 31. In this case, however, we need not resolve the issue of the standard of review because under either standard we would affirm the trial court's order requiring Ann to pay forty percent of P.N.'s post-secondary education.

¶ 58    Only the first factor in section 513(j) is specifically at issue in this appeal—the present and future financial resources of both parties to meet their needs. Although we agree with Ann that Paul makes more money than her, we also must look at *all the money* that the parties have. In doing so, the trial court properly considered the $256,000 that Ann had put into an account allegedly for her daughter's benefit, even though the account was still in Ann's name. It was also the trial court's job to assess Ann's credibility when she said that she had already spent the remaining $100,000 that she had inherited. Even considering the disparities in the parties' annual income, we find that the trial court did not err in requiring Ann to pay 40 percent of her son's college expenses.

¶ 59                                  C. Attorney Fees

¶ 60    Finally, Ann contends that the trial court abused its discretion and violated section 5/508(a) and (j) of the Act when it ordered, *sua sponte*, that she pay $5000 toward Paul's attorney fees when Paul did not file a petition for a fee contribution.

¶ 61    We review an award of attorney fees for an abuse of the trial court's discretion. *In re the Marriage of DeLarco*, 313 Ill. App. 3d 107, 111 (2000). Again, an abuse of discretion occurs when the court's ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. *In re the Marriage of LaRocque*, 2108 IL App (2d) 160973, ¶ 94.

¶ 62    Section 508(a) of the Act provides, in pertinent part:

"At the conclusion of any pre-judgment dissolution proceeding under this subsection, contribution to attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503 and in any other proceeding under this subsection." 750 ILCS 5/508(a) (West 2018).

¶ 63    Section 503(a) provides, in pertinent part:

"After proofs have closed in the final hearing on all other issues between the parties (or in conjunction with the final hearing, if all parties so stipulate) and before judgment is entered, a party's petition for contribution to fees and costs incurred in the proceeding shall be heard and decided***." 750 ILCS 5/503(j) (West 2018).

¶ 64    Ann argues that attorney fees can only be awarded when they are expressly authorized by statute or by agreement of the parties, and where the basis of the award is statutory, a trial court is bound by that statutory grant of authority. *In re the Marriage of Waltrip*, 216 Ill. App. 3d 776, 781 (1991). In response, Paul contends that section 508(b) of the Act provides that a court may, at any time, allocate fees and costs of all parties for a hearing if it finds that a hearing under the Act was precipitated or conducted for any improper purpose. 750 ILCS 5/508(b) (West 2018). Improper conduct under that section include harassment, unnecessary delay or other acts that needlessly increase the cost of litigation. 750 ILCS 5/508(b) (West 2018).

¶ 65    We agree with Paul that the trial court did not abuse its discretion in ordering Ann to pay the modest amount of $5000 toward his attorney fees. First, contrary to Ann's claim, the record reflects that he did make two requests for attorney fees. Second, although the court did not explicitly find that Ann's conduct in filing the petition for indirect civil contempt based upon Paul's alleged violation of the 2009 court order was conducted for an improper purpose, nothing in section 508(b) of the Act requires a specific written finding. 750 ILCS 5/508(b) (West 2018).

Here, the trial court could have reasonably inferred from the evidence presented that Ann only filed her petition for indirect civil contempt against Paul in retaliation for Paul's petition for Ann to contribute toward their son's college expenses. In her petition, Ann never alleged that Paul used the money for an improper purpose. Instead, despite that she knew about the Google Drive spreadsheet for almost ten years and had accessed it in the past, Ann brought the contempt action alleging a technical violation of the notice provision in a decade-old court order. Viewing the fee award in this context, as well as the long history of Ann failing to honor her legal obligations to her son, the court was well within its discretion to issue this fee award. Accordingly, we find no error.

¶ 66                                      III. CONCLUSION

¶ 67      In sum, we find that the trial court properly discharged Ann's petition for rule to show cause as to why Paul should not be held in indirect civil contempt, when the evidence adduced at the trial was clear that Paul's conduct in creating the Google Drive spreadsheet was to inform Ann of their son's expenses and was not a willful or contumacious violation of the 2009 court order. The court also properly imputed income to Ann when the evidence showed that she was underemployed, and that she had created a restricted account with the intent to shield the assets therein from her son's college expenses. The trial court also properly ordered Ann to pay 40 percent of her son's post-educational expenses when the evidence demonstrated that she had the proper resources to pay that amount. Finally, the trial court did not abuse its discretion in ordering Ann to pay $5,000 in Paul's attorney fees when the evidence showed that Ann filed a petition for a rule to show cause as to why Paul should not be held in indirect civil contempt in retaliation for Paul's petition to have Ann contribute to their son's college expenses.

¶ 68      For the following reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 69    Affirmed.